## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY RUBIN, on Behalf of Himself and All Others Similarly Situated, | ) Case No.<br>)<br>) |
| Plaintiff, | ) <u>CLASS ACTION</u><br>) |
| vs. | ) **CLASS ACTION COMPLAINT**<br>) **FOR VIOLATIONS OF THE**<br>) **FEDERAL SECURITIES LAWS**<br>) |
| WEBMD HEALTH CORP., STEVEN L. ZATZ, MARTIN J. WYGOD, MARK J. ADLER, IAN G. BANWELL, NEIL F. DIMICK, JAMES V. MANNING, WILLIAM J. MARINO, JOSEPH E. SMITH, STANLEY S. TROTMAN, JR., and KRISTIINA VUORI, | ) JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>)<br>) |

Plaintiff Jeffrey Rubin ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of WebMD Health Corp. ("WebMD" or the "Company") against WebMD and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9") and to enjoin the expiration of a tender offer (the "Tender Offer") on a proposed transaction, pursuant to which WebMD will be acquired by Kohlberg Kravis Roberts &

Co. L.P., through its affiliate Internet Brands, and Internet Brands' affiliates MH Sub I, LLC ("Parent") and Diagnosis Merger Sub, Inc. ("Purchaser" and together with Kohlberg Kravis Roberts & Co. L.P., Internet Brands and Parent, "KKR") (the "Proposed Transaction").

2.      On July 24, 2017, WebMD and KKR issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell WebMD to KKR.  Under the terms of the Merger Agreement, KKR will acquire all outstanding shares of WebMD for $66.50 in cash per share of WebMD's common stock (the "Offer Price"). Pursuant to the Merger Agreement, KKR, through Parent and Purchaser, commenced the Tender Offer on August 7, 2017.  The Tender Offer is scheduled to expire at 11:59 p.m., New York City time on September 7, 2017.  The Proposed Transaction is valued at approximately $2.8 billion.

3.      On August 7, 2017, WebMD filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC.   The Recommendation Statement, which recommends that WebMD stockholders tender their shares in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) WebMD's financial projections, relied upon by WebMD's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan") in connection with rendering its fairness opinion; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan; (iii) J.P. Morgan's potential conflicts of interest; (iv) the background process leading to the Proposed Transaction; and (v) WebMD insiders' potential conflicts of interest.  The failure to adequately disclose such material information constitutes a violation of Sections 14(d), 14(e) and 20(a) of the Exchange Act as WebMD stockholders need such information in order to make a fully informed decision whether to tender their shares in support of the Proposed Transaction or seek appraisal.

4.      In short, the Proposed Transaction will unlawfully divest WebMD's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.   To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the expiration of the Tender Offer unless and until such problems are remedied.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  WebMD is incorporated in Delaware and is headquartered in this District.   Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of WebMD.

9.     Defendant WebMD is a Delaware corporation with its principal executive offices located at 395 Hudson Street, New York, New York 10014.  The Company is a leading provider of health information to consumers, physicians and other healthcare professionals.  WebMD's common stock is traded on the Nasdaq Stock Market LLC under the ticker symbol "WBMD."

10.     Defendant Steven L. Zatz ("Zatz") has been Chief Executive Officer ("CEO") of the Company since September 2016 and a director of the Company since November 2016. Defendant Zatz previously served as President of the Company from August 2013 until his appointment as CEO.  Defendant Zatz has been a member of the senior leadership of WebMD and its predecessor companies for 17 years.

11.     Defendant Martin J. Wygod ("Wygod") has been Chairman of the Board since May 2005.  Defendant Wygod served as Chairman of HLTH Corporation's ("HLTH") board of directors from March 2001 until its merger with WebMD in October 2009, and as a director of HLTH's board of directors from September 2000 until October 2009.

12.     Defendant Mark J. Adler ("Adler") has been a director of the Company since September 2005.  Defendant Adler previously served as a director of HLTH's board of directors from September 2000 until completion of the merger with WebMD in October 2009.

13.     Defendant Ian G. Banwell ("Banwell") has been a director of the Company since January 2017.

14.     Defendant Neil F. Dimick ("Dimick") has been a director of the Company since September 2005.   Defendant Dimick previously served as a director of HLTH's board of directors from December 2002 until completion of the merger with WebMD in October 2009.

15.     Defendant James V. Manning ("Manning") has been a director of the Company since September 2005.  Defendant Manning previously served as a director of HLTH's board of directors from September 2000 until completion of the merger with WebMD in October 2009.

16.     Defendant William J. Marino ("Marino") has been a director of the Company since April 2014.

17.     Defendant Joseph E. Smith ("Smith") has been a director of the Company since October 2009 and previously served as a director of HLTH's board of directors since September 2000.

18.     Defendant Stanley S. Trotman, Jr. ("Trotman") has been a director of the Company since September 2005.

19.     Defendant Kristiina Vuori ("Vuori") has been a director of the Company since July 2014.

20.     Defendant Doreen A. Toben ("Toben") has been a director of the Company since 2009.

21.     Defendants identified in paragraphs 10 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

22.     Kohlberg Kravis Roberts & Co. L.P is a leading global investment firm that manages investments across multiple asset classes.

23.     Internet Brands is a fully integrated online media and software services organization headquartered in El Segundo, California and a portfolio company of Kohlberg Kravis Roberts & Co. L.P.

24.     Parent is a Delaware limited liability company and an affiliate of Internet Brands.

25.     Purchaser is a Delaware corporation and wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own WebMD common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of August 4, 2017, there were 37,303,875 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by WebMD or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

29.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 14(e) of the Exchange Act;

(c)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(d)    Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

30.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

32.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background

33.    WebMD was incorporated on May 3, 2005 under the name WebMD Health Holdings, Inc. and completed its initial public offering on September 28, 2005.  Prior to that time, WebMD was a wholly-owned subsidiary of HLTH.

34.    WebMD is a leading provider of health information to consumers, physicians and other healthcare professionals through tis websites, mobile apps and health-focused publications. Advertisers and sponsors use *The WebMD Health Network* to reach and engage healthcare professionals and consumers who are interested in healthy living, wellness, diseases and conditions, and other health-related topics.   The Company also markets services under

the *WebMD Health Services* brand that helps employers and health plans improve the health and wellness of their employee and plan participant populations.

35.     WebMD generates revenue from the advertising and sponsorship services of *The WebMD Health Network*, from the wellness services the Company markets to employers and health plans under the *WebMD Health Services* brand, and from certain information services.

36.     On February 16, 2017, the Company reported its fourth quarter and full year 2016 financial results.  For the quarter, revenue was $207.5 million, compared to $192.1 million in the fourth quarter of 2015.  Advertising and sponsorship revenue for the quarter was $171.0 million, compared to $158.3 million in the fourth quarter of 2015.  Net income increased 32% to $36.2 million, compared to $27.5 million in the fourth quarter of 2015.  For the year, revenue was $705.0 million, compared to $636.4 million in 2015.  Advertising and sponsorship revenue was $561.3 million for the year, or 79.6% of the Company's total revenue, compared to $499.0 million for 2015, or 78.4% of WebMD's total revenue.  Net income increased 43% to $91.3 million, compared to $64.0 million in 2015.  Defendant Zatz commented on the fourth quarter and full year 2016 financial results, stating:

> Our financial outlook for this year reflects ongoing uncertainty in the healthcare landscape. While we are not satisfied with the growth we are projecting at the present time for 2017, we remain positive about the longer term opportunity and believe that, as demand for digital health services continues to grow, WebMD and Medscape are uniquely positioned as the market leaders with strong brands, unparalleled engagement of consumer health and physician audiences, and a proven ability to demonstrate value to our customers.

**The Process Leading Up to the Proposed Transaction**

37.     On January 27, 2017, defendant Wygod called a meeting of the Executive Committee of the Board.  Among other topics, the Executive Committee discussed the fact that several private equity funds, including two private equity funds referred to in the

Recommendation Statement as "Sponsor A" and "Sponsor B" had expressed interest in a potential transaction involving the Company.

38.     On February 8, 2017, the Board met to discuss commencing a process to evaluate the Company's strategic alternatives.   At this meeting, defendant Wygod indicated that if the Board proceeded with a process to review strategic alternatives, including a possible sale of the Company, he did not intend to participate with any potential purchasers in connection with the possible sale of the Company.

39.     In March 2017, J.P. Morgan communicated with 122 strategic and financial parties to evaluate their interest in a potential transaction with the Company.   Throughout April and May 2017, 38 parties signed confidentiality agreements, including 19 strategic parties and 19 financial sponsors (excluding KKR).  The Recommendation Statement fails to disclose whether the confidentiality agreements contain don't-ask-don't-waive ("DADW") standstill provisions that are currently precluding any of these 38 interested parties from making a topping bid for the Company.

40.     Beginning on April 19, 2017, J.P. Morgan provided bidders with a process letter establishing May 10, 2017 as the deadline to submit preliminary indications of interest.

41.     On May 10 and May 11, 2017, WebMD received preliminary indications of interest from ten parties (one strategic bidder and nine financial sponsor bidders, including KKR).   These proposals ranged in price from $46.50 per share to $65.00 per share.   A private equity fund referred to in the Recommendation Statement as "Sponsor C" did not submit an indication of interest during the first round of the process, but indicated interest in pairing with other bidders as potential equity partners.

42.     On May 15, 2017, the Board met to discuss the first-round proposals.  Following

discussion, the Board decided to invite KKR, private equity funds referred to in the Recommendation Statement as "Sponsor A," "Sponsor B," "Sponsor D," and "Sponsor E," and a strategic bidder referred to in the Recommendation Statement as "Strategic Party A," to the second round of the process.  The Recommendation Statement fails to disclose the individual per share prices included in the first-round proposals, including the details of the first-round proposals from each of the parties invited to the second round of the process.

43.    On May 21 and May 25, 2017, a strategic bidder referred to in the Recommendation Statement as "Strategic Party B," and a portfolio company of Sponsor A referred to in the Recommendation Statement as "Co-Bidder A," respectively, signed confidentiality agreements with the Company.  The Recommendation Statement fails to disclose whether the confidentiality agreements contain DADW standstill provisions that are currently precluding either Strategic Party B or Co-Bidder A from making a topping bid for the Company.

44.    On June 2, 2017, despite defendant Wygod having previously indicated that he did not intend to participate with any potential purchasers in connection with the possible sale of the Company, defendant Wygod met with Co-Bidder A.

45.    On June 7, 2017, J.P. Morgan provided KKR, Strategic Party A, Sponsor D, Sponsor B, Sponsor A, and Sponsor E with second round process letters, establishing June 11, 2017 as the deadline to submit second-round proposals.

46.    On June 9, 2017, Strategic Party B submitted a preliminary indication of interest to acquire WebMD for $65.00 per share, subject to approval by its board of directors at a July 25, 2017 meeting.

47.    Also on June 9, 2017, Sponsor B notified J.P. Morgan that it was no longer interested in an acquisition of the Company.

48.    On June 12, 2017, a private equity fund referred to in the Recommendation statement as "Sponsor F" verbally proposed to defendant Wygod a revised non-binding indication of interest to acquire WebMD for $61.00 per share.  However, the Board did not invite Sponsor F into the second round of the process.

49.    On June 14 and June 27, 2017, Sponsor E and Sponsor D, respectively, each indicated it was no longer interested in an acquisition of the Company.

50.    On June 27, 2017, defendant Wygod met with KKR to discuss its level of interest in an acquisition of the Company and the overall timing of the process, despite defendant Wygod having stated at the February 8, 2017 Board meeting that he did not intend to participate with any potential purchasers in connection with the possible sale of the Company.

51.    On July 18, 2017, defendant Wygod again met with KKR and Parent and indicated he would be willing to assist in any transition of the Company.

52.    On July 20, 2017, Strategic Party B indicated it was no longer interested in an acquisition of the Company.

53.    Also on July 20, 2017, each of the three remaining bidders submitted the following proposals: (i) Parent and KKR submitted a proposal to acquire the Company for $62.35 per share; (ii) Strategic Party A submitted a proposal to acquire the Company for $62.00 per share; and (iii) Sponsor A submitted a proposal to acquire the Company for $62.00 per share. Following discussion, the Board directed J.P. Morgan to request that each bidder submit their best and final offers by 6:00pm on July 22, 2017.

54.    On the evening of July 22, 2017, the Board received the following proposals: (i) Parent and KKR submitted a proposal to acquire the Company for $66.50 per share; (ii) Strategic Party A verbally submitted a proposal to acquire the Company for $64.11 per share; and (iii)

Sponsor A submitted a proposal to acquire the Company for $63.62 per share.

55.    Later that evening, the Board met to review preliminary results for the quarter ended June 30, 2017.   Defendant Zatz then recused himself and he and Blake DeSimone ("DeSimone"), WebMD's Chief Financial Officer ("CFO") were not present for the remainder of the meeting.   The Board discussed the three final proposals it received and determined to negotiate final definitive documentation with Parent and KKR.

56.    The next morning, the Board resumed its meeting and J.P. Morgan rendered its fairness opinion.   Following discussion, the Board approved the Merger Agreement without defendant Zatz's participation.

57.    Prior to the opening of U.S. stock markets on July 24, 2017, Parent, Purchaser and the Company executed the Merger Agreement.

**The Proposed Transaction**

58.    On July 24, 2017, following execution of the Merger Agreement, WebMD and KKR issued a joint press release announcing the Proposed Transaction.   The press release stated, in relevant part:

> NEW YORK, NY – July 24, 2017 – WebMD Health Corp. (NASDAQ: WBMD), the leading source of health information, and Internet Brands, a KKR portfolio company, today announced that Internet Brands has entered into a definitive agreement to acquire WebMD in a transaction valued at approximately $2.8 billion.
>
> Under the terms of the agreement, a subsidiary of Internet Brands will commence a tender offer in the next 10 business days to acquire all of the issued and outstanding shares of WebMD common stock for $66.50 per share to be paid in cash upon completion of the transaction. This valuation represents a premium of approximately 30 percent to WebMD's share price on February 15, 2017, the day before WebMD announced that it was commencing a process to explore and evaluate potential strategic alternatives, as well as a premium of approximately 20 percent over WebMD's closing share price on July 21, 2017. The financing for the transaction is fully committed. The WebMD Board of Directors approved the merger agreement. The acquisition is expected to close during the fourth quarter

of 2017, subject to the satisfaction of customary closing conditions.

* * *

"WebMD and Medscape are the market leaders in online health with unparalleled reach to consumers and healthcare professionals," said Bob Brisco, CEO of Internet Brands. "Since its founding, WebMD has established itself as a trusted resource for health information. We look forward to delivering that resource to even more users, by leveraging our combined resources and presence in online healthcare to catalyze WebMD's future growth."

"KKR and Internet Brands are pleased to be investing behind the experienced WebMD management team and trusted WebMD platforms. The combined portfolio of leading vertical internet assets will be a powerful one," said Herald Chen, Chairman of Internet Brands, KKR Member and Head of the Technology industry team. "We look forward to supporting and accelerating the growth and global expansion of the businesses."

**Insiders' Interests in the Proposed Transaction**

59.    WebMD and KKR insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of WebMD.

60.    Notably, it appears that certain members of Company management have secured positions for themselves following completion of the Proposed Transaction.  According to the Recommendation Statement, "Pursuant to the Merger Agreement, the officers of WebMD immediately prior to the Effective Time will be the initial officers of the Surviving Company until their respective successors are duly elected or appointed and qualified or until the earlier of their death, resignation or removal in accordance with the certificate of incorporation and by-laws of the Surviving Company."  Recommendation Statement at 10.

61.    Further, Company insiders stand to reap a substantial financial windfall for securing the deal with KKR.  Pursuant to the Merger Agreement, all unvested equity-based

awards held by Company executives will be converted into the right to receive cash payments. The following tables set forth the cash payments WebMD's executive officers stand to receive in connection with their vested and unvested equity awards:

| Name | Total Number of Outstanding Company Stock Options[1] | Total Consideration for Outstanding Company Stock Options ($)[2] |
|---|---|---|
| **Non-Employee Directors**: | | |
| Mark J. Adler, M.D. | 62,700 | 1,692,240 |
| Ian G. Banwell | 13,200 | 204,732 |
| Neil F. Dimick | 114,488 | 3,333,745 |
| James V. Manning | 79,200 | 2,246,508 |
| William J. Marino | 52,800 | 1,115,664 |
| Joseph E. Smith. | 82,500 | 2,099,856 |
| Stanley S. Trotman, Jr. | 85,800 | 2,271,984 |
| Kristiina Vuori, M.D.. | 52,800 | 1,025,508 |
| **Executive Officers**: | | |
| Blake DeSimone. | 135,000 | 2,622,100 |
| Michael B. Glick | 217,500 | 4,892,675 |
| Rick Treese | 95,000 | 2,759,350 |
| Douglas W. Wamsley. | 207,500 | 4,848,625 |
| Martin J. Wygod | 133,334 | 2,678,352 |
| Steven L. Zatz, M.D. | 645,000 | 18,810,800 |

| Name | Total Number of Outstanding Restricted Shares[1] | Total Consideration for Outstanding Restricted Shares ($)[2] | Total Number of Outstanding Performance Shares[3] | Total Consideration for Outstanding Performance Shares ($)[4] |
|---|---|---|---|---|
| **Executive Officers**: | | | | |
| Blake DeSimone. | 23,500 | 1,562,750 | — | — |
| Michael B. Glick | 28,000 | 1,862,000 | — | — |
| Rick Treese | 9,584 | 637,336 | — | — |
| Douglas W. Wamsley. | 28,000 | 1,862,000 | — | — |
| Martin J. Wygod | 71,667 | 4,765,856 | 25,000 | 1,662,500 |
| Steven L. Zatz, M.D. | 62,500 | 4,156,250 | 30,000 | 1,995,000 |

14

62.     Moreover, if they are terminated in connection with the merger, WebMD's named executive officers will receive substantial severance benefits, including cash payments, in the form of golden parachute compensation, as set forth in the following table:

| Name | Cash[1] ($) | Equity[2] ($) | Perquisites / Benefits[3] ($) | Tax Reimbursement[4] ($) | Total ($) |
|---|---|---|---|---|---|
| Blake DeSimone[5] | 680,000 | 3,573,800 | — | — | 4,253,800 |
| Michael B. Glick[5] | 637,500 | 4,370,338 | 1,000 | — | 5,008,838 |
| Douglas W. Wamsley[5] | 637,500 | 4,370,338 | 26,000 | — | 5,033,838 |
| Martin J. Wygod[6]. | 5,725,000 | 8,642,532 | 57,000 | 0 | 14,424,532 |
| Steven L. Zatz, M.D.[7]. | 1,437,500 | 12,199,150 | 26,000 | — | 13,662,650 |

## The Recommendation Statement Contains Material Misstatements or Omissions

63.     Defendants filed a materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to WebMD's stockholders. The Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to tender their shares in connection with the Tender Offer or seek appraisal.

64.     Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) WebMD management's projections, including the projections utilized by the Company's financial advisor, J.P. Morgan, in its financial analyses; (ii) the valuation analyses prepared by J.P. Morgan in connection with the rendering of its fairness opinion; (iii) J.P. Morgan's potential conflicts of interest; (iv) the background process leading up to the Proposed Transaction; and (v) WebMD insiders' potential conflicts of interest. Accordingly, WebMD stockholders are being asked to make a decision whether to tender their

shares in connection with the Tender Offer or seek appraisal without all material information at their disposal.

***Material Omissions Concerning WebMD's Financial Projections***

65.     The Recommendation Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

66.     The Recommendation Statement fails to disclose material information relating to the Company's projections provided by WebMD's management and relied upon by J.P. Morgan for its analyses.

67.     For example, the Recommendation Statement sets forth:

J.P. Morgan calculated the present value of unlevered free cash flows that WebMD is expected to generate: (i) during the remainder of 2017 (applying a valuation date as of June 30, 2017) by calculating unlevered free cash flows for the remainder of 2017 by subtracting actual unlevered free cash flows as of the first half of 2017 from the applicable 2017E unlevered free cash flow based upon Management Forecasts, (ii) for calendar years 2018 through 2021 based upon Management Forecasts and (iii) for calendar years 2022 through 2026 based upon extrapolations of the Management Forecasts that were prepared by J.P. Morgan with the consent of WebMD and which were used by J.P. Morgan in connection with its financial analyses and in rendering its fairness opinion. J.P. Morgan also calculated a range of terminal values for WebMD at December 31, 2026 by applying perpetual growth rates ranging from 2.0% to 3.0% for unlevered free cash flow of WebMD during the terminal period of the projections.

Recommendation Statement at 28.  The Recommendation Statement, however, fails to disclose the Company's unlevered free cash flows for calendar years 2022 through 2026, and the line items used to calculate unlevered free cash flows.

68.     The Recommendation Statement also discloses projections for various non-GAAP metrics including Adjusted EBITDA and Unlevered Free Cash Flow for calendar years 2017 through 2021, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP for calendar

years 2018 through 2021.  The omission of the aforementioned line item projections renders the non-GAAP projections included in the Recommendation Statement materially misleading and incomplete.

69.    The importance of reconciling between GAAP and non-GAAP financial measures has long been widely acknowledged.  The SEC adopted "Regulation G" in 2003, in response to the mandate set forth in Section 401(b) of the Sarbanes-Oxley Act that rules be enacted to regulate the use of pro forma financial information.  Regulation G prohibits the use of non-GAAP financial measures outside of SEC filings unless they are accompanied by the most directly comparable GAAP accounting measure, as well as a reconciliation of the two.  Such reconciliations were deemed necessary to address the proliferation of non-GAAP financial measures lacking a uniform definition and therefore carrying the risk of misleading investors.

70.    The omission of this information renders the statements in the "Financial Analyses and Opinion," "Company Management Forecasts" and "Explanation of Non-GAAP Financial Measures and Reconciliations to GAAP Financial Measures" sections of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning J.P. Morgan's Financial Analyses***

71.    The Recommendation Statement describes J.P. Morgan's fairness opinion and the various valuation analyses performed in support of its opinion.  However, the description of J.P. Morgan's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, WebMD's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on J.P. Morgan's fairness opinion in determining whether to tender their shares in

connection with the Tender Offer or seek appraisal. This omitted information, if disclosed, would significantly alter the total mix of information available to WebMD's stockholders.

72.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) as mentioned above, the calendar year 2022 through 2026 unlevered free cash flows utilized by J.P. Morgan in this analysis and the line items used to calculate unlevered free cash flows; (ii) the inputs and assumptions underlying the discount rate range of 8.0% to 10.0%; (iii) J.P. Morgan's basis for using an assumed perpetuity growth rate range of 2.0% to 3.0% in calculating a range of terminal values for WebMD; (iv) the implied terminal value multiples resulting from the analysis; and (v) the value of additional tax savings from the usage of net operating losses and research and development credit carry forwards of WebMD for the projected period used by J.P. Morgan in the analysis.

73.     With respect to J.P. Morgan's *Public Trading Multiples* analysis, the Recommendation Statement fails to disclose the individual multiples and financial metrics for the companies observed by J.P. Morgan in the analysis. A fair summary of such an analysis requires the disclosure of the individual multiples for each company utilized or, at a minimum, the high, low, mean and median multiples. Merely providing the range that a banker applied is insufficient, as stockholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied valuation of the Company.

74.     With respect to J.P. Morgan's *Selected Transaction Analysis*, the Recommendation Statement similarly fails to disclose the individual multiples and financial metrics for the transactions observed by J.P. Morgan in the analysis.

75.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

76.     The omission of this information renders the statements in the "Financial Analyses and Opinion" and "Company Management Forecasts" sections of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

### *Material Omissions Concerning J.P. Morgan's Potential Conflicts of Interest*

77.     The Recommendation Statement provides:

In addition, during the two years preceding the date of J.P. Morgan's opinion, J.P. Morgan and its affiliates received approximately $87.9 million of aggregate fees from affiliates of Parent (including KKR and its portfolio companies) for corporate finance, treasury and asset management services. Such services during such period have included acting as joint lead arranger on a credit facility of an affiliate of Parent in April 2016. During the two years preceding the date of J.P. Morgan's opinion, J.P. Morgan and its affiliates have had commercial or investment banking relationships with affiliates of Parent and with portfolio companies of KKR that are unrelated to the Offer and Merger, for which J.P. Morgan and such affiliates have received customary compensation. Such services during such period have included debt syndication, equity and debt underwriting and financial advisory services for such portfolio companies. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of affiliates of Parent and such portfolio companies, for which it receives customary compensation or other financial benefits.

Recommendation Statement at 30.  The Recommendation Statement, however, fails to disclose, during the two years preceding the date of J.P. Morgan's opinion: (i) the amount of "customary

compensation" J.P. Morgan and its affiliates received in connection with its commercial or investment banking relationships with affiliates of Parent and with portfolio companies of KKR; and (ii) the "customary compensation or other financial benefits" J.P. Morgan received in connection with its commercial banking affiliate acting as an agent bank and a lender under outstanding credit facilities of affiliates of Parent and such portfolio companies. *Id.*

78.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

79.     The omission of this information renders the statements in the "Background of the Merger; Reasons for Recommendation" and "Financial Analyses and Opinion" sections of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

80.     The Recommendation Statement omits material information relating to the sale process leading up to the Proposed Transaction.

81.     Critically, the Recommendation Statement fails to expressly indicate whether the confidentiality agreements WebMD entered into with 38 parties, excluding KKR are still in effect and/or contain DADW standstill provisions that are presently precluding each and every of these 38 parties from making a topping bid for the Company.

82.     The disclosure of the terms of the standstill provisions is crucial to WebMD stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

83.    The omission of this information is particularly harmful to WebMD stockholders as the Company received competitive indications of interest from a variety of parties, who would now be foreclosed from making a topping bid, including: (i) Sponsor F which had participated in the first round of the process, and proposed a revised preliminary, non-binding indication of interest to acquire the Company at $61.00 per share, on June 12, 2017, but was not to invited by the Board into the second round of the process; and (ii) Strategic Party B who submitted a preliminary non-binding indication of interest for the acquisition of the Company at a per share price of $65.00 on June 9, 2017.

84.    Notably, the confidentiality and non-disclosure agreement entered into on April 6, 2017, between WebMD and KKR contains a DADW standstill provision with a term of eighteen months making it highly likely that the non-disclosure agreements entered into with the 38 parties during the sale process also contain DADW standstill provisions.

85.    In addition, the Recommendation Statement fails to provide WebMD's stockholders with material information necessary to evaluate whether the Board's decision to shut Sponsor F out of the sale process, who proposed a purchase of WebMD at $61.00 per share was reasonable.  Namely, the Recommendation Statement sets forth that "[t]he Board decided not to invite Sponsor F into the second round of the process based on its level of interest relative to other bidders," (Recommendation Statement at 16) but fails to disclose the per share prices included in the proposals from each of KKR, Sponsor A, Sponsor B, Strategic Party A, Sponsor D and Sponsor E, the parties who were invited into the second round of the process.

86.    The omission of this information renders the statements in the "Background of the Merger" section of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Insiders' Potential Conflicts of Interest***

87.     The Recommendation Statement also materially misleads stockholders as to the potential conflicts of interest faced by WebMD management and the Board.

The Recommendation Statement sets forth that "[p]ursuant to the Merger Agreement, the officers of WebMD immediately prior to the Effective Time will be the initial officers of the Surviving Company until their respective successors are duly elected or appointed and qualified or until the earlier of their death, resignation or removal in accordance with the certificate of incorporation and by-laws of the Surviving Company."   Recommendation Statement at 10. Additionally, the Company's July 24, 2017 press release quoted Herald Chen, Chairman of Internet Brands, KKR Member and Head of the Technology industry team, who stated "KKR and Internet Brands are pleased to be investing behind the experienced WebMD management team and trusted WebMD platforms."   Yet, the Recommendation Statement completely fails to set forth any of the employment related discussions and negotiations that occurred between KKR and WebMD executive officers, including who participated in all such communications, when they occurred, and their content.   The Recommendation Statement further fails to disclose whether any of KKR's prior proposals or indications of interest mentioned management retention.

88.     Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

89.    Moreover, the Recommendation Statement sets forth that at the February 8, 2017 Board meeting defendant Wygod indicated that if the Board proceeded with a process to review strategic alternatives, including a possible sale of the Company, he did not intend to participate with any potential purchasers in connection with the possible sale of the Company. Recommendation Statement at 13.  However, defendant Wygod proceeded to meet with potential purchasers during the sale process, including with (i) Co-Bidder A on June 2, 2017 (Recommendation Statement at 16); (ii) KKR on June 27, 2017 and July 18, 2017. Recommendation Statement at 17, 18.

90.    The Recommendation Statement fails to disclose what necessitated defendant Wygod's initial decision to not participate with any potential purchasers and why defendant Wygod disregarded his decision.

91.    Furthermore, at the July 23, 2017 Board meeting to "(i) determine[] that the Merger Agreement and the Transactions are fair to and in the best interests of the Company and its stockholders, (ii) declare[] it advisable to enter into the Merger Agreement, (iii) approve[] the execution, delivery and performance by the Company of the Merger Agreement and the consummation of the Transactions, (iv) resolve[] that the Merger shall be effected under Section 251(h) of the DGCL and (v) resolve[] to recommend that holders of Shares accept the Offer and tender their Shares to Purchaser pursuant to the Offer", defendant Zatz recused himself from voting on the matter.  The Recommendation Statement is silent, however, as to the reasons why defendant Zatz recused himself from voting on the matter and if his recusal was linked to his procuring a unique benefit for himself.

92.    Such information is material to WebMD stockholders before their critical decision on the Proposed Transaction to (i) assess the Board's decision to enter into the Merger

Agreement with KKR; (ii) assess whether the decision to enter into the Merger Agreement was clouded by conflicts of interest; and (iii) be fully informed whether the Board has erected measures to preclude the possibility of a topping bid by interested parties.

93.      Defendants' failure to provide WebMD stockholders with the foregoing material information renders the statements in the "Employment Arrangements with Executive Officers" and "Background of the Merger; Reasons for Recommendation" sections of the Recommendation Statement false and/or materially misleading and constitutes a violation of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act, and SEC Rule 14d-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation Statement.  Absent disclosure of the foregoing material information prior to the expiration of the Tender Offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to tender their shares in favor of the Proposed Transaction or seek appraisal and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Class Claims Against All Defendants for Violations
### of Section 14(d) of the Exchange Act and SEC Rule 14d-9

94.      Plaintiff repeats all previous allegations as if set forth in full.

95.      Defendants have caused the Recommendation Statement to be issued with the intention of soliciting WebMD stockholders to tender their shares in the Tender Offer.

96.      Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

97.    The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omission renders the Recommendation Statement false and/or misleading.

98.    Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

99.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision whether to tender their shares or seek appraisal if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**Class Claims Against All Defendants for Violations of Section 14(e) of the Exchange Act**

100.    Plaintiff repeats all previous allegations as if set forth in full.

101.    Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in light of the

circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the Tender Offer.

102.    Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender his shares or seek appraisal pursuant to the Tender Offer.

103.    As a direct and proximate result of these defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender his shares or seek appraisal.

## COUNT III

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

104.    Plaintiff repeats all previous allegations as if set forth in full.

105.    The Individual Defendants acted as controlling persons of WebMD within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of WebMD and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

106.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the

issuance of the statements or cause the statements to be corrected.

107.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

108.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

109.    By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of WebMD, and against defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  August 9, 2017

**WEISSLAW LLP**

By _____

Richard A. Acocelli
1500 Broadway, 16th Floor
New York, New York 10036
Telephone: 212/682-3025
Facsimile: 212/682-3010
Email: racocelli@weisslawllp.com

*Attorneys for Plaintiff*